Inauguration of the Library 2011-1038 Betcher Industries v. Bunzel, U.S.A. Now, I take it you're Mr. Lamb? I'm Mr. Norman. Mr. Norman. I'm Mr. Lamb. Mr. Lamb, there you are. So, Mr. Norman, you're going to do the affirmative appeal and I take it that Mr. Lamb then will respond to the cross-appeal. Is that correct? I will be doing all of the arguing on behalf of... Oh, I see. Okay, very well. You've... I... We had you down as two separate counsels. We are wrestled on the air. All right. Well, we'll see. Maybe he lost. We'll find out as the argument progresses. All right, very well. Why don't you go ahead. May it please the court. Two of Bunzel's three issues on appeal concern anticipation. And with respect to anticipation, there's only one question. Are the chamfers of the prior art pre-1998 Betcher blades capable of ever serving as bearing surfaces? Turning first to the trial court's denial of Bunzel's judgment as a matter of law, the parties agree that the pre-1998 Betcher blade is prior art with respect to the 325 patent. The parties agree as to the shape of that blade, of the prior art blade. The parties agree that the chamfers of that prior art blade are frustaconical. Bunzel's expert and Betcher's expert agree and acknowledge that the chamfers can function as bearing surface. Is the question whether they can function or whether they necessarily possess the capability of functioning? Well, if they can function, they do necessarily possess the capability. So it's one in the same as far as you're concerned. It is one in the same. Now, it doesn't have to serve as a bearing surface for any possible use that this blade would be put in order for it to be an anticipatory reference. But as long as those chamfers are ever capable, I mean, in other words, is there at least one circumstance in which those surfaces would always be capable of serving as a bearing surface, then it meets the claim limitation. Does it matter that one of ordinary skill in the art looking at this prior art structure would not think of those surfaces as a bearing surface because they're just knocked off hard corners? Does that matter at all? It does not matter at all as to the issue of anticipation. And this court's case law confirms that. And I'd cite the court to Lagan and Platt v. Vutec where the court said that recognition in the prior art is irrelevant. I mean, yeah, recognition by one of ordinary skill in the art is irrelevant to that issue. And now at trial, there was a test housing that held one of these blades. And both experts were able to spin, I'm sorry, the test housing supported the blade solely by the chamfered surfaces of the blade. Both experts were able to spin the blade and acknowledge that in that configuration, the chamfered surfaces were functioning as bearing surfaces. And now there were additional testing that had been done beforehand by Bunzel's expert. But what Boettcher's expert argued or at least questioned is whether those chamfered surfaces would be practical to use the chamfered surfaces as bearing surfaces in a commercial environment. But again, turning to this court's case of Lagan and Platt, the fact that technology may be impractical does not undermine an otherwise anticipatory disclosure. So because both experts acknowledge that the chamfers can serve as bearing surfaces, no issue remained for the jury to decide. And so the court should reverse the trial court's denial of the judgment as a matter of law. Now as for this question also, though, is important to the second issue for Bunzel. So we're going to turn now to Bunzel's motion for new trial on the issue of anticipation. The trial court committed reversible error in its jury instructions because the jury instructions took the jury away from the one issue, the one question that really needed to be decided. Based on the court's jury instructions, the jury was focused not on whether these the jury was focused on what one of ordinary skill in the art, how they would have interpreted those bearing surfaces. And, well, a chamfer isn't usually used as a bearing surface. But it's not based on what one of ordinary skill in the art would have recognized to use this, but rather whether these surfaces were capable. I mean, in other words, a chamfer is merely a name. And so when you're talking about what is a bearing surface, it doesn't depend on the item sitting there alone. It's got to be the interaction of the item, of the blade, in a housing or in something that's going to be supporting it. Because no surface just sitting there constitutes a bearing surface. It's going to be the use to which the item is put. And all Bechert came up with is a new use for an old item. And they're trying to get a patent on that old item, not its method of use, at least not with respect to the 325 patent itself. And so it's not, the case law of this court is clear. One cannot obtain a patent directed to a product based on a new use for that product. Now that the court also erred in failing to come up with, in failing to interpret or construe the term bearing surface. So on that issue, I didn't see that you objected to the court's instruction as failing to include a definition of bearing surface. Well, we did, because what we did, okay. Our objections occur in the record A2284, line 19, to 2286, line 24. Line 19 to 2286, line 24. And we also proposed, we also proposed a definition for the term. Where's the definition again? I'm looking at 2284, but, yes. Oh, here on 2285, line 3, is that what you're referencing? Yes, your honor. Okay. So that was, this was, what's the context of 22, what part of the case is this, 2277 through 85? All right, so 2285, I mean, this section here are the objections at trial. I mean, objections to jury instructions. This was in the charge conference or? Well, the way the court actually did it, we had an informal conference, but yes, this is, this is placing it on the record. This was counsel's opportunity to place it on the record. And then we also, in our, in our objections, I believe we also included it. And I believe this is in this section as well. Okay. Now, and this is, and the position that Bunzel took in connection with this issue, as far as the interpretation, is consistent with the position Bunzel took at the Markman hearing and at the preliminary injunction hearing. It was a combined Markman hearing, preliminary injunction hearing. And at the hearing, it was Bunzel's position that a, surface is a bearing surface as long as it can function as a bearing surface, as long as it does have that capability. And so that is the position that Bunzel took throughout. Bunzel also, from the, from the initial part of the case, Bunzel argued that the court, that it's incumbent upon the court to construe the terms at issue. And it was Becher's position that the court didn't need to construe the term bearing surface because it's an ordinary English word and that the court didn't need to construe ordinary English words. We cited this court's precedent, O2 micro and every penny counts. And it didn't matter. It didn't change Becher's approach and it didn't change the court's approach. And so what the court did is it effectively left claim construction to the jury. Had the jury been properly instructed, then Becher would not have been able to make effective argument that it depends upon what one of ordinary skill in the art does. What does that, what does that term mean to you, the bearing face structure, that limitation? Is it a structural limitation, functional? Is it a recitation of intended use? Well, to the extent it has, I mean, it is a name. So to the extent there's, I mean, if it's just a name, then it's just a surface that's, that's frustaconical. And there really isn't any functional limitation to it at all. And so as long as the surface has a, I mean, as long as a blade would have these two frustaconical surfaces, then it really doesn't even matter whether it's a bearing surface or not because it's just a name. But if it is... You mean you ignore the word bearing? No, I'm not saying it is ignored. I'm not saying it necessarily is. I'm saying as to looking at whether it's a structural limitation or a functional limitation. To the extent the name itself means anything and is provided meaning, it is a functional limitation. So it is going to be the purpose of this surface or this is a surface. Maybe it's a functional definition of a structural item. I'm sorry? Maybe it's a functional definition of a piece of structure. It's a structure that is capable of performing a function. Certainly. And that's what I'm saying. So if it is a bearing surface, it is a surface that is capable of performing that function. And so, and that's we have treated in our briefs and how we treated it to the core. That it is a functional, that's a functional element of a structure. So the structure is a surface, a frustaconical surface, and its function is it serves as a bearing surface. And I see that I'm in my rebuttal, so I'll reserve my thoughts. We'll hear from Mr. Schunk. May it please the court. I feel as though I must begin by correcting Mr. Norman when he said that there was no dispute or that Boettcher agreed that the 1998 Blades chamfers could serve as bearing surfaces. In fact, that was strongly disputed by Boettcher and its witnesses at trial. Mr. Whitehead, the inventor and a person of ordinary skill in the art testified, and I quote, you would never use that kind of a corner at that kind of a size for a bearing surface. But it can be used as a bearing surface, and the experiments during the trial proved that out, didn't it? And no, Your Honor, they didn't. The experiment that was done by Mr. King did not use this bearing. Remember that the claims are directed to a rotary knife blade having certain characteristics. The 1998 blade, which really wasn't a 98 blade, it was a more recent blade that had certain characteristics of a 1998 blade, was placed in a jig or a mock-up that did not have any of the characteristics of a rotary knife blade handle. It was not operated at the speeds rotary knife blades are operated at. It was not used to cut the things rotary knife blades normally cut. It was simply placed in a jig that had three small ball bearings, and it was rotated using a power drill at a much slower speed for about a minute or two when Mr. King did his initial test. Did the blade rotate? Did it rotate? It did rotate, but as Dr. Prowl said, I would not recognize it to be a load-bearing surface. It's just the opposite. It's to avoid having any load appear on the surface. That's what he said about the chamfer, and he pointed out that, and this is the admission that they quote, they asked him, that's our expert, these chamfers, as I understand what you're saying, it's not practical that they would serve as bearing surfaces, correct? He answered, yes. Question, but it's not impossible. He said, impossible? I'll grant you it's not impossible. How long it lasts, whether it's functional, those are other issues. He was not willing to admit that as a practical matter, these chamfers could ever serve as load-bearing surfaces. Does it matter that it worked exceptionally well, moderately well? But it didn't work at all, your honor, because it was never tested in the context of the claim. The claim is to a rotary knife. This was not tested as a blade for a rotary knife. It was tested, it was simply put in a contraption in which it rotated. Is there any significance to the fact that the claim doesn't specify for the bearing surfaces any dimensions, or any characteristics, or any tolerances, or strengths, or anything of that sort, simply very broadly states a bearing surface? I don't think it matters that the claim doesn't recite those elements. That's why the testimony of persons of ordinary skill in the art was necessary as a factual matter, because the jury needed to be assisted by having people who understood what a bearing surface means as an engineer tell them, is this something that an engineer would expect to function as a bearing surface? Is this something that actually could function as a bearing surface? And the testimony from our witnesses was that it could not serve in that fashion. So that factual matter was resolved by the jury in our favor, and it should be allowed to stand. What would have been the problem with the district court defining bearing surface for the jury? Well, first of all, your honor, I'm not sure that would have made any difference. I guess we can all guess that the case may have come out the same, or maybe not, but as a district court, if you were presented with the question of, would you please give us a definition, wouldn't you say, sure? Well, I'm not sure everybody up there in the jury is going to understand what a bearing is, so sure, I'll define it. Why not? Remember the context, your honor. Wouldn't you give such an instruction? I wouldn't if nobody asked me to, and the fact is no one did ask the court to until the jury charge conference. Well, that's sort of where you're supposed to make a request. At the time of the jury charge conference, your honor, there was no argumentation put on about why the defendant's proposed language was appropriate. There was no effort to make any explanation about why this charge they wanted to have should be applicable. That's your argument, that they didn't give enough of an explanation for why they should define a term? They didn't give any explanation, your honor, but moving beyond that issue, what was the thing that they requested? The charge that they wanted was that a bearing surface be something capable of supporting a load bearing. Well, that was the issue that our experts and our witnesses testified about on both sides. Their witnesses seemed to think that it was capable of doing that. Our witnesses said it wasn't capable of doing that, and so the factual issue was addressed to the jury properly. There really wasn't a dispute about this, about what a bearing surface means, assuming that Bunsell really means what it says, and that is that its preferred definition is something that is capable of serving to support another member. So I'm not sure that, you know, the every penny case, for example, your honor, says that you don't construe everything. You only construe phrases where there's a dispute between the parties about the phrase. Here, really the dispute that was tried to the jury was, are these chamfers capable of serving as bearing surfaces in the context of a rotary knife? The witnesses disagreed. Ours said no. The jury believed our witnesses, and that's how we went on that issue. I don't see why that factual finding should be disturbed by this court over an issue that doesn't seem to present any difference between the parties. I don't know that there has ever been a showing by Bunsell that if its language had been adopted and expressly said by the court to the jury, that there would have been any other result in the case. Isn't capability like a litmus test, and shouldn't the possibility of performing the function be enough? Just the mere possibility. I think that if there had been factual evidence that it was possible that these chamfers could serve as a bearing surface in the context of a rotary knife, that might have been evidence that the jury legitimately could have considered with regard to the argument made by the defendant. But as I've pointed out, there never was testimony that these chamfers could serve in that context. And in fact, there was strong testimony to the contrary, that the chamfers would not work. In fact, Mr. White had explained to the jury that the chamfers were so small in diameter that they would actually dig into the mating surface and cause the machine to foul and to stop moving. Dr. Prowl explained that the shape of the chamfers was so contrary to what he would expect in the context of being a bearing surface, that there was no way lubrication could stay on that chamfer and allow the product to function. And without lubrication, the product again would seize up. So we explained to the jury exactly why these chamfers were not, quote, capable of serving as bearing surfaces. That should be enough, even accepting the definition of bearing surface that Bunsell came up with at the time of the jury charge conference. The word capable of, and I think we've been sort of dancing around this question, can cover a pretty broad spectrum from conceivably could be used in a pinch versus is the natural use that you would expect it to have. Where on that spectrum do you think the right definition of capable of falls? I should say, your honor, that I think that the pre-1998 prior blades fall off the scale because the testimony from our witnesses was, even in a pinch, you couldn't get these things to work. That was the testimony of our witnesses. Your witnesses that the other side, you may argue it was a pinch, but they said, well, look, we can make it work. Well, I think that's why the jury needs the assistance of testimony by persons of ordinary skill in the art. To bring me back to the question though, I'm really kind of looking for how you regard the term capable of as meaning in a more precise way than just capable of. Your honor, I think that you need to look at the claim. The claim says in the context of a rotary knife blade. And the question should be, could these surfaces function in normal use in a rotary knife blade? Could they do that? And that's the question that needs to be answered. And the answer to that is no. If I may briefly, your honor, turn to another point that I think needs to be addressed, even though Mr. Norman didn't mention it. Regarding this issue of the question of whether the preclusive effect of inter partes reexamination should have been applied in this case. The argument that the appellant seems to have dropped down to at the end is simply that Vetcher's proposed construction of the term, which embodies the congressional intent to have inter partes reexamination be a cheap alternative to litigation, not an adjunct that costs litigation. Their final argument was, well, if you adopt Vetcher's construction of section 315, then it would divest third party requesters who are unsuccessful of their ability to appeal. Because section 317 says that if you are unsuccessful in your reexam, you can't institute another reexam. In fact, they're wrong about that. Section 317 would not have the result of divesting them of their right to appeal to the Board of Patent Appeals and ultimately to this court. Section 317 would simply say that they would no longer have the right to institute another reexamination proceeding with regard to the issues that were raised or could have been raised in the first proceeding. We're talking about the term finally determined, of course. Yes. It struck me that section 316A may give us some guidance as to the meaning of that term because there, the reference is to when the time for appeal has expired or any appeal proceeding is terminated, the director shall issue and publish a certificate canceling any claim of the public patent finally determined to be unpatentable. That seems to contemplate a final determination after the appeal, don't you think? I don't think so, Your Honor. I think that there is a final determination when the Patent Office acts and issues a right to appeal notice. This is simply saying that at the time, I'm sorry, before it goes to the BPAI. Yes. Right. But that would, I mean, BPAI is, of course, part of the Patent Office as well. You mean the examiner? I mean, right, the issuance of the right of appeal notice, the RAN, by the examiner. Yes. Right. But why doesn't 316A at least suggest that final determination, finally determined, is a reference to the period after the time for appeal has expired or the appeal proceeding is terminated, which is the language that's used in that section? I don't think that it's clear either way from 316. I don't think 316 is helpful, Your Honor, because the patent claim can be finally determined to be unpatentable when the right of appeal notice issues. Well. If, on the other hand. But why? Because, I mean, it's not, it depends on what definition you give to the term final. I mean, it's not final in the sense that it's not reviewable. We know that. It may be final in the sense that a district court order is final, but it's certainly reviewable. So it is not final in the sense that it is unchangeable, right? I believe this Court, Your Honor, must look to congressional intent. If Bunsell's reading of this statute is adopted, and this is a matter of first impression to this Court, if their reading is adopted, it guts the congressional intent from Section 315 because there is never going to be a time when there's going to be collateral, when there's going to be a stoppal applied, because the process of appeal is so lengthy that, in fact, there's always going to be the trial and the result of the trial and the matter will still be moving through the Board of Patent Appeals. It's going to get to this Court. Well, let's suppose Director Kapos is successful in reducing the amount of time by which proceedings in the Patent Office go forward, both before the examiners and before the BPAI, to the extent that an appeal only takes four months, let's say. I suppose he decides to treat these kinds of cases separately, an appeal would take four months. That argument goes away then. So we're left with the statutory argument as to what is the meaning of finally determined, as opposed to the idea of a final decision, which is the final decision of the examiner. Why isn't that a rational way to construe the two terms as they're used in the statute? Well, Your Honor, the argument about the length of time goes away, but the argument about the adding to the cost of litigation, rather to allow an alternative to litigation, doesn't go away. Remember that the choice of whether to file an inter partes re-exam is within the ultimate and complete control of Bunzel, the third-party requester. They chose to have their matter adjudicated at the Patent Office rather than in the District Court, and Congress gave them the ability to do that. But having chosen that, in the words of the Sony case, you can begin a race with two horses, but ultimately only one horse is going to cross the line. What do you think should be done in a case such as this, if, in fact, after the District Court has entered an order predicated on the examiner's decision, and the District Court case ends, but it turns out that the examiner's decision is reversed. What do you do then? Well, at that point, if they're assuming that appeals support the Board of Patent Appeals' decision to reverse or whatever, at that point then there would be an end to perhaps injunctive relief that may have been ordered by the court. But, you know, this is always possible. You could have litigation that goes on and terminates in one direction, and then an ex parte re-examination might be filed a year or two later that results in the invalidating of the patent on which a judgment had been entered before the trial court. What's done in those cases? It's sort of a natural consequence of there being two different bodies that may consider these issues. But given the possibility of this kind of dilemma, the one suggested by Judge Bryson, then doesn't it make more sense to consider as outlined in 316? I just think, Your Honor, that that's doing an injustice to what Congress wanted. Congress wanted these to be alternative drafts. It's the end of proceedings in the patent office and a natural conclusion to that activity. It seems to me to be perfectly reasonable and a little premature to say that the final determination is just when the examiner is finished, but not necessarily the patent office. Well, in fact, when the examiner's finished, it isn't all over for the requester because the requester can appeal. What's all over is simply the ability to run your horse race in two different, essentially to run two different horses. All that's over is the ability to multiply the litigation by litigating in two fronts at the same time. And that's what Congress wanted. I think Judge Drain has a question for you. Yes, Your Honor. Yes, I'm going to take you back to a little hypothetical. Suppose an enterprising fellow wandered into the trial that you had and sat down and watched the jury rig experiment that you were talking about and said, you know, I think I got something here, and went home, got in the garage, and by nightfall had fashioned a rotary knife that utilized the champers, or what you're calling the champers, and then goes into the kitchen, pulls out a ham, and the thing slices the meat off the bone. If that was to occur, would you not say that there's anticipation with the prior art? Well, of course, that evidence was never presented to the jury, and nothing like it was ever presented to the jury. And I would have to, I'm not a person of ordinary skill. I can see the point that Your Honor is making, that that would, in fact, demonstrate that the trial, there was no evidence that the champers could be used as bearing surfaces in a rotary knife. There simply was no evidence. Okay. Thank you, Your Honor. Why don't we hear a rebuttal? I think that Mr. Noman has a little time left. Thank you. With respect to evidence of it operating in a blade, I mean, operating in a rotary knife, actually, Dr. King, Bunzel's expert, did testify that the blade, that the chamfered surfaces could serve as bearing surfaces, even in a commercial environment. But looking at what's witnesses, and Mr. Shunk talked about the testimony of Mr. Whited, the inventor. Well, Mr. Whited gave conclusory statements. But in, under Sixth Circuit law, conclusory statements are insufficient to defeat a judgment as a matter of law. And I'd cite the, for that proposition, I'd cite, uh, the court to two cases. The first is Davis v. Browse-McDowell, 596 F. 3rd, 1355. That's actually a Fed circuit. That's one of our cases. That's a Fed circuit case applying Sixth Circuit law on this point. Now that was in the, now that case was in the context of summary judgment, not judgment as a matter of law. We have dozens of those cases. Right, right. But in, but under Sixth Circuit law, judgments as a matter of law and summary judgments are actually treated similarly. So, so that law would apply as well. Now, with respect to Mr. Whited's testimony, another point, though, is to actually look at the 325 patent itself, as to how it addresses this. And I'd direct the court to, um, to column seven, lines 31 through 33, which appears on page 47 of the appendix. And there it says, bearing contact line segments assure that the blade and blade support structure engage only along extremely small contact areas. So even in the context of the 325 patent, Mr. Whited is discussing the desirability of very tiny contact areas. So Mr. Whited's testimony at trial is contradicting exactly what he said in the 325 patent at issue. If we look at the claims of the 325 patent, we see that the claims of 325 patent are directed to a blade. It's not directed to a knife. There are no requirements about the knife. There's nothing in the 325 patent claims that describe the speed at which this would work. And also, Boettcher is talking about some type of a commercial rotary knife. Well, if it's not a commercial, if it's just a household rotary knife, then the speeds wouldn't have to be that great. One wants high speed if you're talking about a meatpacking plant. You're talking about a kitchen, you're not going to need these speeds. So whether it would operate commercially is irrelevant. Matter of fact, even in a household function, how long it has to operate, it really doesn't matter either. But in any event, it would so operate. Okay, so Mr. Shunk said that the first time that this issue was raised... One final point. Mr. Shunk, we're running well over here. I'm sorry? If you can make one final point, if you have one final point. So the final point would be... Okay, I'll make one final point. Well, don't feel compelled. Give me the honor, I'll take it. It wasn't a command, it was an invitation. No, I will take it. You know the point. The one final point I would make would be, Mr. Shunk said that there wasn't evidence, or the first time we raised this argument was at trial, and that's not true. It was raised at the Markman hearing, the combined Markman preliminary injunction hearing, and that was, and the citation for that would be 2679, line 2, to page 2680, line 21. Thank you. Very well. Thank you. Um, I think that we... I didn't hear any argument on the cross-appeal, if I'm not mistaken, so I think that we won't have SIR or BUTTON. Thank you. Then the case is submitted. We thank both counsel.